Joseph M. R. Covey (7492) (jcovey@parrbrown.com)
Michael T. Hoppe (8790) (mhoppe@parrbrown.com)
Claire M. McGuire (17678) (cmcguire@parrbrown.com)
**PARR BROWN GEE & LOVELESS**
101 S. 200 E., Suite #700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

*Attorneys for Jonathan O. Hafen, Receiver*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN O. HAFEN, in his capacity as Court-appointed Receiver,<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD A. LARSEN, in his individual and trustee capacity for the LARSEN TRUST, ANDRIA SCOTT, AMANDA PARRISH, CALI PARKS and BRIAN LARSEN, in their individual capacities, and DOES 1-10,<br><br>Defendants. | **COMPLAINT**<br>(Ancillary Suit – General Order 19-001)<br><br>Case No. 2:21-cv-00743-TC<br><br>Judge Tena Campbell |

Jonathan O. Hafen (the "Receiver"), in his capacity as Court-appointed Receiver over the assets of Rust Rare Coin, Inc. ("RRC"), Gaylen Dean Rust, R Legacy Racing Inc., R Legacy Entertainment LLC, and R Legacy Investments LLC, and affiliated individuals and entities, (collectively, the "Receivership Defendants"), hereby alleges, avers, and complains of

Defendants Richard A. Larsen, the Larsen Trust, Andria Scott, Amanda Parrish, Cali Parks and Brian Larsen, and DOES 1-10, (collectively the "Defendants") as follows:

## INTRODUCTION

1. The Receivership Defendants have been operating a classic Ponzi scheme since at least tax year 2008 by soliciting funds from investors in violation of federal commodities and securities laws and using the funds obtained to pay bogus returns to earlier investors.

2. In the course of the Ponzi scheme, the Receivership Defendants made numerous material misrepresentations and omissions, misappropriated investor and other funds, and committed fraud as a commodity pool operator.

3. On November 13, 2018, the Commodity Futures Trading Commission ("CFTC") and the Utah Division of Securities ("DOS") filed a Complaint against the Receivership Defendants in the United States District Court for the District of Utah, Civil No. 2:18-cv-00892- TC-DBP (the "CFTC Action").[1]

4. The CFTC and DOS allege that the Receivership Defendants fraudulently solicited over $200 million from investors who they tricked into believing that the Receivership Defendants were pooling their investments for the purposes of trading physical silver (the "Silver Pool").

5. The CFTC and DOS further allege that there was, in fact, no meaningful amount of Silver Pool. Instead, the Receivership Defendants operated a massive Ponzi scheme whereby they used money from new investors to pay fraudulent returns to earlier investors.

6. On November 15, 2018, the Receiver was appointed by this Court to identify,

collect, and preserve the assets of the Receivership Estate for the benefit of the estate's creditors, including the hundreds of defrauded investors.

7. The instant action is brought by the Receiver as part of his continuing duty to: (1) recapture and return investor funds that were sent to the Receivership Defendants and then diverted in the course of their Ponzi scheme, and (2) avoid fraudulent transfers of property belonging to the Receivership Defendants.

## PARTIES, JURISDICTION, AND VENUE

8. Jonathan O. Hafen was appointed November 15, 2018, as Receiver for the assets of the Receivership Defendants in the CFTC Action.

9. Richard A. Larsen ("Mr. Larsen") an individual is a recipient of funds from the Ponzi scheme.

10. On information and belief, the Larsen Trust for which Mr. Larsen is, and was during all relevant times, the trustee, is a recipient of funds from the Ponzi scheme.

11. Upon information and belief, individuals Andria Scott, Amanda Parrish, Cali Parks and Brian Larsen are recipients of funds from the Ponzi scheme by way of either initial or subsequent transfers from Mr. Larsen individually or from the Larsen Trust. These individuals received funds from the Ponzi scheme through subsequent gifts or other transfers that were not for value.

12. Does 1-10 are individuals whose identities are not known who, on information and belief, may have received funds from the Ponzi scheme through initial or subsequent gifts or transfers that were not for value. This Complaint will be amended as the identities of Does 1-10 are determined through fact discovery in this matter.

13. This Court has jurisdiction over the subject matter of this action because it is ancillary to the CFTC Action and the appointment of the Receiver by this Court.

14. Defendants have sufficient minimum contacts with Utah that personal jurisdiction is appropriate in this Court. Personal jurisdiction is also proper pursuant to 28 U.S.C. §§ 754, 1692.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 754.

## THE RECEIVER, STANDING, AND STATUS OF CFTC ACTION

16. On November 15, 2018, in the CFTC Action, this Court entered an Order Granting Plaintiffs' Ex Parte Motion for Statutory Restraining Order, Appointment of Receiver, and Other Equitable Relief, appointing Mr. Hafen as Temporary Receiver.

17. On November 27, 2018, this Court entered an Order Appointing Receiver and Staying Litigation (the "Appointment Order"), appointing Mr. Hafen as permanent Receiver.

18. Pursuant to the Appointment Order, the Receiver was to take control of all property of the Receivership Estate, wherever located.

19. The Receiver was further authorized to initiate suit to recover any and all property of the Receivership Estate in the possession of third parties.

20. Since entry of the Appointment Order, preliminary injunctions have been entered as to all Receivership Defendants.

## THE FRAUDULENT PONZI SCHEME

21. Gaylen Dean Rust ("Rust") owned and operated RRC, a specialty coin shop in Salt Lake City, Utah, dealing in rare coins, precious metals, and other memorabilia.

22. From at least tax year 2008, Rust also operated a massive Ponzi scheme through

4

which he and others defrauded over 430 individuals out of over $200 million.

23. The Receivership Defendants promoted the Silver Pool as an exclusive investment opportunity through which individual investors both contributed money and recruited their friends and family to invest as word spread about the investment returns Receivership Defendants were purportedly generating.

24. Receivership Defendants told investors and prospective investors that they were using the money contributed to the Silver Pool to purchase and store physical silver for investment.

25. Receivership Defendants claimed to use funds contributed to the Silver Pool to purchase physical silver, which was then stored at Brinks storage facilities in Salt Lake City, Utah and Los Angeles, California.

26. Receivership Defendants claimed that they generated profits for investors by selling physical silver held in the Silver Pool when market prices began to decline and, after such decline, they used the profits from the sale to purchase a larger quantity of silver at a lower price.

27. Through this process, Receivership Defendants claimed they were able to consistently increase the number of ounces of silver held in the Silver Pool and, consequently, increase the value of each investor's share of the Silver Pool.

28. Receivership Defendants further represented that only fifty percent of the silver held in the Silver Pool was traded at any given time, meaning that there was always at least fifty percent of the silver physically held at Brinks facilities.

29. Receivership Defendants told investors that they were able to consistently sell silver at higher prices and purchase silver back at lower prices because they had insider

knowledge of when market prices would decline. Specifically, Rust claimed that he received information from an analyst at a large global bank when the bank and other large market participants planned to sell large quantities of physical silver, thereby driving down prices.

30. Receivership Defendants told investors that they could generate high rates of return for the Silver Pool, often representing that they were able to generate consistent returns of twenty to twenty-five percent. Receivership Defendants told some investors that they had consistently generated returns as high as forty percent between 2013 and 2018.

31. Receivership Defendants represented that they had approximately $80 million in physical silver stored at Brinks facilities in Utah and California.

32. Receivership Defendants also promoted variations on the Silver Pool at various points in time.

33. For example, some investors were told their funds would be used to purchase gold rather than silver, which gold would be traded in a similar manner as the silver to generate returns. Receivership Defendants also claimed to generate profits for investors by using the investors' silver and gold as inventory for Rust Rare Coin's retail operation, selling their silver and gold at retail prices, replacing their silver and gold inventory, and paying commissions to the investors who provided the inventory, all while replacing and increasing the quantity of silver and gold held at the store ("Commission Scheme").

34. But Receivership Defendants' representations were false. There is no evidence that Receivership Defendants ever traded silver or gold in the manner they described to Silver Pool investors or that investors' funds were used to purchase silver or gold, or to restock inventory that was then sold at retail prices.

35. Receivership Defendants did not store significant quantities of silver at any Brinks facility.

36. The Receiver has discovered no evidence that investors' funds were used to purchase, store, or trade physical metals in the manner described by Receivership Defendants.

37. Instead, Receivership Defendants misappropriated funds invested in the Silver Pool to make payments to other investors in the Silver Pool in the manner of a Ponzi scheme.

38. Additionally, Receivership Defendants transferred money contributed by Silver Pool investors to other entities owned by Rust, including but not limited to R Legacy Entertainment, R Legacy Racing, and R Legacy Investments.

39. None of these other entities owned any trading or similar accounts used to buy or sell silver or other precious metals and none had a legitimate right to funds sourced from Silver Pool investors.

## **DEFENDANTS' INVESTMENT IN AND RECEIPT OF FUNDS FROM THE SILVER POOL**

40. Defendant Richard A. Larsen and his father, now deceased, participated in the Silver Pool and the Commission Scheme.

41. Andria Scott never invested with Rust and provided no other value in exchange for transfers made to her.

42. Amanda Parrish never invested with Rust and provided no other value in exchange for transfers made to her.

43. Cali Parks never invested with Rust and provided no other value in exchange for transfers made to her.

44. Brian Larsen never invested with Rust and provided no other value in exchange

for transfers made to him.

45. Beginning in or around August 2009, Defendants received monthly payments by check or direct debit from Receivership Defendants.

46. Beginning in or around January 2016, Defendants received several payments from Receivership Defendants in the form of precious metals.

47. Although Defendants usually received payments on a regular monthly basis, Defendants sometimes received no payments and other times received multiple payments in the same month.

48. In sum, withdrawals made by Defendants total approximately $8,137,792.

49. Receivership Defendants transferred money to Defendants with the actual intent to hinder, delay, or defraud creditors.

50. Certain of the Defendants memorialized their arrangement with Receivership Defendants in a writing dated May 8, 2013, called the *Precious Metals Custody Agreement* (the "Agreement").

51. The Agreement purported to reflect gold and silver holdings being maintained by Receivership Defendants on behalf of certain Defendants.

52. In reality, the Receiver has discovered no evidence that Receivership Defendants maintained stores of gold or silver on behalf of such Defendants. Rather, such Defendants' interactions with Receivership Defendants constituted merely one permutation of the Silver Pool Ponzi scheme.

53. The Agreement represents that Richard A. Larsen reviewed account statements from The Brinks Company showing the holdings of Rust Rare Coin Inc.

54. The Agreement further represents that Richard A. Larsen has reviewed or has had the opportunity to review all trading statements of A-Mark and other trading distributors showing all trades made by Receivership Defendants from January of 2009 to May 2013.

55. The Agreement also details the amount of commission that Defendants were receiving, as 50% of the retail sale of precious metals from Rust Rare Coin.

56. Pursuant to the Agreement, Defendants also had the right to inspect the books of Receivership Defendants in order to ensure the validity and accuracy of the monthly statements from The Brinks Company and various trading distributors.

## FIRST CLAIM FOR RELIEF
### (Fraudulent Transfer)

57. Plaintiff hereby incorporates paragraphs 1 through 56 of the preceding Complaint by reference.

58. Receivership Defendants operated the Silver Pool, gold trading scheme and Commission Scheme as a Ponzi scheme since at least tax year 2008.

59. Defendants received payments in cash and precious metals totaling approximately $8,137,792 from Receivership Defendants.

60. Because Receivership Defendants operated the investment and inventory schemes as a Ponzi scheme, as a matter of law, the transfers to Defendants were made with the intent to hinder, delay, or defraud creditors.

61. In addition, the transfers to Defendants were made at a time when Receivership Defendants were insolvent, and Receivership Defendants did not receive reasonably equivalent value in exchange for the transfers.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

62. Plaintiff hereby incorporates paragraphs 1 through 56 of the preceding Complaint by reference.

63. Receivership Defendants conferred a benefit upon Defendants when Defendants received payments from the Silver Pool.

64. Defendants know and understand the benefit they received.

65. It would be unjust, under the circumstances, to allow Defendants to retain payments from the Silver Pool in excess of their individual contributions.

**WHEREFORE**, Plaintiff prays as follows:

A. That the Plaintiff be awarded damages against Defendants in an amount to be determined at trial, plus prejudgment and post judgment interest, costs and attorney fees;

B. For such other relief as the Court may allow.

**DATED** this 20th day of December, 2021.

**PARR BROWN GEE & LOVELESS, P.C.**

/s/ Claire M. McGuire
Joseph M.R. Covey
Michael T. Hoppe
Claire M. McGuire
*Attorneys for the Receiver*