IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN O. HAFEN, in his capacity as court-appointed Receiver,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD A. LARSEN, in his individual capacity and as a trustee for the LARSEN TRUST; ANDRIA SCOTT, an individual; AMANDA PARRISH, an individual; CALI PARKS, an individual; BRIAN LARSEN, an individual; and DOES 1–10,<br><br>Defendants. | ORDER AND MEMORANDUM DECISION DENYING MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:21-cv-743-TC-CMR<br><br>Judge Tena Campbell<br>Magistrate Judge Cecilia M. Romero |

Before the court is a motion for summary judgment filed by Defendants Andria Scott, Amanda Parrish, Cali Parks, and Brian Larsen (the Beneficiary Defendants). (ECF No. 61.) The court previously deferred ruling on this motion to allow Plaintiff Jonathan O. Hafen (the court-appointed Receiver) time for additional discovery. (See Order dated Apr. 28, 2023, ECF No. 72.) The additional time has passed, and the parties have filed supplemental briefs. Having considered the briefing and relevant law, the court finds that oral argument is unnecessary. See DUCivR 7-1(g). For the following reasons, the court denies the Beneficiary Defendants' motion.

## BACKGROUND

This matter is an ancillary action to Commodity Futures Trading Commission v. Rust

1

Rare Coin Inc., No. 2:18-cv-892, a case which is also pending in this court. In Rust Rare Coin, the court found the existence of a Ponzi scheme and appointed Mr. Hafen as Receiver over the assets of Rust Rare Coin, Inc. (RRC), Gaylen Dean Rust, and affiliated individuals and entities (the Receivership Defendants). (See Order Appointing Receiver dated Nov. 27, 2018, ECF No. 54 in Case No. 2:18-cv-892.) As part of his duties, the Receiver has filed numerous ancillary actions seeking the recovery of funds from individuals and entities who benefitted from the existence of the fraudulent scheme. The Receiver also entered into over 170 tolling agreements with various investors. (Receiver's Fifth Quarterly Status Report, ECF No. 287 in Case No. 2:18-cv-892 at 3.)

Defendant Richard Larsen, who does not join in the current motion for summary judgment, was the Trustee of both his parents' trusts (collectively, the Larsen Trust) after his mother's death in 2012. (Defs.' Mot. Summ. J., ECF No. 61 at 5; Pl.'s Suppl. Opp'n, ECF No. 85 at 3.) The sole beneficiaries of the Larsen Trust were Mr. Larsen and his brother Ronald's four children, the Beneficiary Defendants. (ECF No. 85 at 3–4.) The Larsen Trust held real property, securities, and other assets, as well as bullion coins associated with RRC. (See id. at 4.)

On April 1, 2013, Mr. Larsen executed the Precious Metals Custody Agreement (PMCA) with RRC and Mr. Rust, which proposed a liquidation scheme in which Mr. Larsen would receive 50% of the trust property and each of Ronald's children would receive 12.5% of the trust property. (PMCA ¶ G, ECF No. 61-1 at 155.) The PMCA contains three additional paragraphs detailing the division and distribution of the trust property that are relevant to the current dispute:

> K. Pending further discussions with the other beneficiaries of the Larsen Trust … Richard A. Larsen anticipates that the division and distribution … will proceed as follows: (i) substantially all of the real property, marketable securities and other assets will be allocated and distributed to the issue of Ronald E. Larsen;

2

> (ii) Bullion Coins will be liquidated in an amount necessary such that liquidation proceeds, when added to the property described in clause (i), will equal the total amount to be distributed to the children of Ronald E. Larsen, and such liquidation proceeds will be distributed to the issue of Ronald E. Larsen; and (iii) the balance of the Bullion Coins will be allocated and distributed from the Larsen Trust to Richard A. Larsen.
>
> L. Richard A. Larsen anticipates that, as part of the distribution plan described in Paragraph K above, he and the other beneficiaries will enter into an agreement by which Richard A. Larsen will be credited (or charged with) (i) all commissions resulting from the use of Bullion Coins in Rust Rare Coins, Inc.'s inventory … (ii) all profits and gains (or losses) … resulting from the trading of Bullion Coins …, and (iii) all appreciation (or depreciation) in the value of the Bullion Coins ….
>
> M. This Agreement therefore contemplates (i) the liquidation of a portion of the Bullion Coins relatively soon after the signing of this Agreement in order to permit the trustee of the Larsen Trust to make the described distributions to the children of Ronald E. Larsen …. Notwithstanding the expectations set forth in Paragraphs K and L and this Paragraph M, the Parties acknowledge that as a result of discussions among the beneficiaries, the allocations and distributions … might not ultimately reflect the descriptions set forth herein ….

(Id. at 155–56.)

On July 22, 2013, three months after the PMCA was executed and after the death of Mr. Larsen's mother, Mr. Larsen entered into a settlement agreement (the Settlement) with the Beneficiary Defendants that outlined how the assets in the Larsen Trust would be liquidated and distributed. (App'x to Pl.'s Suppl. Opp'n, ECF No. 85-1 at 14–111.) The Settlement stated that the Larsen Trust contained the following assets: "(i) $4,333,415 … in the form of precious metals held at Rust Rare Coins, Inc., (ii) $1,809,959 … in the form of Real Property interests …, and (iii) $738,591 … in the form of three annuities …." (Id. at 15.)

Under the Settlement, each of the Beneficiary Defendants was to receive $645,197 (minus amounts that had already been paid out). (Id. at 17.) The Settlement stated:

> [T]he Parties anticipate that the liquidation proceeds of Real Property Interests may supply sufficient funds to cover the balance of the [Beneficiary Defendants'] Base Distribution. However, in the event the liquidation proceeds of Real

3

> Property Interests do not supply sufficient funds to cover the balance of the [Beneficiary Defendants'] Base Distribution, the Trustee will liquidate precious metals in an amount necessary to pay the balance of the [Beneficiary Defendants'] Base Distribution.

(Id. at 19.)  A schedule attached to the Settlement listed the preliminary distributions each Beneficiary Defendant had received, specified the amount of a base distribution to be provided on July 31, 2013, and contemplated that each Beneficiary Defendant would receive $378,102 from sales of real estate as those sales occurred.  (Id. at 96.)  The schedule provided that the Beneficiary Defendants would receive amounts from sales of silver "as needed (probably -0-)." (Id.)

The Receiver entered into negotiations with Mr. Larsen after the court declared the existence of a Ponzi scheme in November 2018.  (See Order dated Nov. 15, 2018, ECF No. 22 in Case No. 2:18-cv-892; Letter from Rita M. Cornish to Richard A. Larsen dated Sept. 11, 2019, ECF No. 62-3 (initiating negotiations with Mr. Larsen).)  On April 10, 2020, Mr. Larsen's counsel provided the Receiver with a copy of the PMCA over email.  (Email from James Tracy to Rita M. Cornish dated Apr. 10, 2020, ECF No. 61-1 at 151–71.)  The Receiver alleges that discussions continued over the next two years, including settlement negotiations and input from expert accountants.  (Decl. Michael Hoppe, ECF No. 62-2 at ¶ 8.)  The Receiver further provides evidence that he received an email on September 17, 2021, in which Mr. Larsen's counsel stated: "As we have been analyzing this matter, it appears that some portion of what the Receiver is calling winnings from Rust Rare Coin was received by Rick in a fiduciary capacity … for the benefit of Rick's nieces and nephews … and was distributed to them as documented in the 2013 Precious Metals Custody Agreement."  (Email from James Tracy to Joseph M.R. Covey dated Sept. 17, 2021, ECF No. 62-4 at 1.)  The email stated that the amount Mr. Larsen's nieces and

4

nephews received from the trust "may have exceeded $2,000,000." (Id.)

Counsel for the Receiver asked for further information and stated: "This is the first time we've heard of Rick claiming he only received some of the funds in his representative capacity." (Email from Joseph M.R. Covey to James Tracy dated Sept. 20, 2021, ECF No. 62-4 at 1.) The Receiver then filed his complaint asserting claims against Mr. Larsen and the Beneficiary Defendants on December 20, 2021. (Complaint, ECF No. 2.)

## LEGAL STANDARD

### I. Summary Judgment

A court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"For there to be a genuine dispute of fact, there must be more than a mere scintilla of evidence, and summary judgment is properly granted if the evidence is merely colorable or is not significantly probative." GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co., 960 F.3d 1255, 1259 (10th Cir. 2020)). "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" Id. (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

"[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015)

5

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Anderson, 477 U.S. at 248).  "At 'the summary judgment stage the judge's function is not [ ] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Id. (quoting Anderson, 477 U.S. at 249).

"Defendants 'may use a motion for summary judgment to test an affirmative defense,' such as a statute of limitations defense …." Donner v. Nicklaus, 197 F. Supp. 3d 1314, 1322 (D. Utah 2016), aff'd 700 F. App'x 877 (10th Cir. 2017) (quoting Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997)).  But "[d]efendants who move for summary judgment on an affirmative defense bear a more stringent burden of proof that requires them to 'establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case.'" Id. (quoting Donner v. Nicklaus, 778 F.3d 857, 876 (10th Cir. 2015)).

## ANALYSIS

The Beneficiary Defendants contend that the Receiver's action against them is barred by the relevant statute of limitations.  Under the Utah Uniform Voidable Transactions Act, a claim for relief regarding a transfer must be brought "no later than four years after the transfer was made … or, if later, no later than one year after the transfer … was or could reasonably have been discovered by the claimant …." Utah Code Ann. § 25-6-305(1).

The Beneficiary Defendants assert that no distributions made to them from the Larsen

6

Trust occurred after April 2015,[1] which was over four years before the Receiver filed this action on December 20, 2021, and that therefore the Receiver must rely on the one-year discovery rule. When a discovery rule applies under Utah law, the court considers two concepts to determine when a claim could reasonably have been discovered. "The first is inquiry notice; the second is reasonable diligence: Was plaintiff on notice that she might have a cause of action for the loss of her funds and, if so, was she reasonably diligent in investigating the facts surrounding her loss?" Anderson v. Dean Witter Reynolds, Inc., 920 P.2d 575, 579 (Utah Ct. App. 1996).

The Beneficiary Defendants contend that the Receiver was on inquiry notice of the potential claims against them no later than April 20, 2020, after Mr. Larsen's counsel emailed the Receiver a copy of the PMCA. They point specifically to three passages in that agreement. First, the PMCA states that each of the Beneficiary Defendants is entitled to a share of 12.5% of the trust property. (PMCA ¶ G, ECF No. 61-1 at 155.) Second, the agreement contemplates that "Bullion Coins will be liquidated … and such liquidation proceeds will be distributed to the [Beneficiary Defendants.]" (Id. ¶ K, ECF No. 61-1 at 156.) Finally, the PMCA states: "This Agreement therefore contemplates … the liquidation of a portion of the Bullion Coins relatively soon after the signing of this Agreement in order to permit the trustee of the Larsen Trust to make the described distributions to the children of Ronald E. Larsen[.]" (Id. ¶ M, ECF No. 61-1 at 156.) Based on this language, the Beneficiary Defendants contend that the receipt of the PMCA put the Receiver on inquiry notice of potential claims against them and that the Receiver was not reasonably diligent in investigating these claims within one year from the receipt of that

---

[1] As discussed below, the Receiver argues that it remains unclear if and when there were distributions from the Larsen Trust to the Beneficiary Defendants.

email.

The court is not persuaded by this argument for several reasons. First, the PMCA is more ambiguous than the construction urged by the Beneficiary Defendants. Paragraph K, for instance, states that liquidation proceeds from Bullion Coins will be distributed to the Beneficiary Defendants—but only "in an amount necessary such that such liquidation proceeds, when added to the property in clause (i), will equal the total amount to be distributed to the [Beneficiary Defendants.]" (Id. ¶ K, ECF No. 61-1 at 156.) The clause referenced contemplates that "substantially all of the real property, marketable securities and other assets will be allocated and distributed to the [Beneficiary Defendants.]" (Id. at 155-56.) In other words, the PMCA generally contemplates the following allocation: RRC assets to Mr. Larsen and remaining (non-RRC) assets to the Beneficiary Defendants—with the exception that some RRC assets may be sold off if necessary to achieve the 12.5% share of each Beneficiary Defendant.

The PMCA also states that Mr. Larsen and the Beneficiary Defendants will "enter into an agreement" by which Mr. Larsen will gain the benefits and assume the risks of any change in value of the Bullion Coins, thereby reiterating the general allocation of RRC assets to Mr. Larsen. (Id. ¶ L, ECF No. 61-1 at 156.) Finally, the PMCA is speculative about the liquidation of some portion of the Bullion Coins to be distributed to the Beneficiary Defendants. Paragraph M states: "Notwithstanding the expectations set forth in Paragraphs K and L and this Paragraph M, the Parties acknowledge that as a result of discussions among the beneficiaries, the allocations and distributions of the [Larsen Trust] might not ultimately reflect the descriptions set forth herein …." (Id. ¶ M, ECF No. 61-1 at 156; see also id. ¶ K (conditioning the requirements of that paragraph on "pending discussions").) The PMCA therefore proposes a distribution plan

but also conditions that plan on further agreements of the parties.

After the court granted the Receiver's Rule 56(d) motion (see Order dated Apr. 28, 2023, ECF No. 72) and the parties engaged in further written discovery, the Receiver submitted evidence of the Settlement entered into on July 22, 2023, by the Beneficiary Defendants and Mr. Larsen. (ECF No. 85-1 at 14–111.) The Settlement anticipated that "the liquidation proceeds of Real Property Interest may supply sufficient funds to cover the balance of the Children's Base Distribution." (Id. at 19.) This assumption appears reasonable from the face of the Settlement, as it stated that the Larsen Trust contained "$1,809,959 … in the form of Real Property Interests" and "$738,591 … in the form of three annuities" (id. at 15), more than enough assets to cover the $645,197 (minus amounts already paid out) that each Beneficiary Defendant was to receive. (See id. at 17; see also Richard A. Larsen's Responses to Receiver's Second Set of Discovery Requests, Request for Admission No. 2, ECF No. 85-1 at 114 (admitting that the Larsen Trust distributed less than $2.8 million in total to the beneficiary defendants); Richard A. Larsen's Responses to Receiver's Third Set of Discovery Requests, Admission No. 7, ECF No. 85-1 at 117 (admitting that the proceeds from non-RRC assets in the Larsen Trust exceeded $2.9 million).) Indeed, the schedule attached to the Settlement listing the preliminary distributions already received by each Beneficiary Defendant provided that the Beneficiary Defendants would receive amounts from sales of silver "as needed (probably -0-)." (Settlement, ECF No. 85-1 at 96.)

The Settlement included that, "in the event the liquidation proceeds of Real Property Interests do not supply sufficient funds to cover the balance of the [Beneficiary Defendants'] Base Distribution, the Trustee will liquidate precious metals in an amount necessary to pay the

9

balance ….." (Id. at 19.) But it remains unclear whether any such liquidation ever occurred.

Other than the potential sale referenced in the PMCA and the Settlement, no evidence from several years of negotiations between the Receiver's counsel and Mr. Larsen prior to September 17, 2021, suggests that there was a liquidation of RRC assets that benefitted the Beneficiary Defendants. Indeed, the Beneficiary Defendants themselves dispute that they received any proceeds from such a sale. (ECF No. 61 at 7 n.2.) Mr. Larsen, whose net winnings from the fraudulent scheme would be reduced to the extent that proceeds from the sale of RRC assets went instead to the Beneficiary Defendants, did not assert that such a distribution occurred until the email dated September 17, 2021. (See Hoppe Decl., ECF No. 62-2 at ¶ 8 ("After years of discussions between the Receiver's counsel and Mr. Larsen, including a joint discussion with two expert accountants representing the Receiver and Mr. Larsen, the correspondence dated September 17, 2021, was the first time Mr. Larsen had claimed that any of the Ponzi scheme funds at issue had been transferred to anyone other than Mr. Larsen.").)

Given this context, the court finds that the Receiver has provided evidence raising genuine issues of material fact about whether the Beneficiary Defendants ever received the proceeds of RRC assets—and, more importantly for this motion, about whether the references to a potential sale in the PMCA were sufficient to put the Receiver on inquiry notice of the potential claims against the Beneficiary Defendants and whether he was reasonably diligent in investigating those claims.

In the Tenth Circuit, the question of "[w]hether a plaintiff 'knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury.'" Klein v. Cornelius, 786 F.3d 1310, 1323 (10th Cir. 2015) (referring to statute of limitations under predecessor to the UVTA containing identical limitations language and quoting Maughan v. SW

Servicing, Inc., 758 F.2d 1381, 1387 (10th Cir. 1985)); see also Russell Packard Dev., Inc. v. Carson, 108 P.3d 741, 746 (Utah 2005) ("[D]etermining when a plaintiff either discovered or reasonably should have discovered his or her cause of action is often a difficult and intensely fact-dependent inquiry …."). The evidence the Receiver presented raises genuine factual issues about when the Receiver should have discovered the claims against the Beneficiary Defendants. Accordingly, summary judgment is precluded as a matter of law.

## ORDER

For the foregoing reasons, the Beneficiary Defendants' Motion for Summary Judgment (ECF No. 61) is DENIED.

DATED this 13th day of February, 2024.

BY THE COURT:

*Tena Campbell*
Tena Campbell
United States District Judge